The foregoing memorandum constitutes our findings of fact and conclusions of law on the issue of liability.

See also D.C., 250 F.Supp. 60.

**FIRST NATIONAL BANK OF HOLLYWOOD, Dorothy Buchman and A. Sander Buchman, as Executors of Samuel Buchman, Deceased, Plaintiffs,**

v.

**AMERICAN FOAM RUBBER CORPORATION, Milton R. Ackman, as Trustee of A F R, Marie Louise deMontmollin, Alexander F. Pathy and Suzanne M. Pathy, Defendants.**

No. 60 Civ. 2328.

United States District Court
S. D. New York.

July 23, 1969.

Whyman & Whyman, New York City, for plaintiffs; Martin N. Whyman, New York City, of counsel.

Winer, Neuburger & Sive, New York City, for defendants; David Sive, New York City, of counsel.

Kleeberg & Greenwald, New York City, for defendant Ackman; Jacob Greenwald, New York City, of counsel.

## OPINION

COOPER, District Judge.

American Foam Rubber Corporation (hereinafter AFR) was organized in 1950 under the laws of the State of New York. From the time of organization

until May 17, 1957, Samuel Buchman served as its president and operating head. On the latter date an agreement (hereinafter the Buy-Sell Agreement) was entered into between Buchman and the individual defendants, Alexander F. Pathy (hereinafter Pathy), Suzanne M. Pathy (Pathy's wife) and Marie Louise deMontmollin (also a relative), under the terms of which Buchman sold his entire stock interest in AFR and Burlington Holding Corporation (hereinafter Burlington) [1] to the individual defendants and resigned as an officer and director of AFR.[2] AFR's business was thereafter conducted by Pathy as president and the other individual defendants as officers and directors.

To induce Buchman to sell his capital stock, Pathy and deMontmollin agreed to subordinate certain debentures of the corporations then held by them to the rights of holders of specified debentures then held by Buchman. The terms of this subordination are embodied in subparagraph A of the SIXTH paragraph of the Buy-Sell Agreement:

The parties named below hold five (5%) percent registered debentures issued by American Foam or Burlington in the following respective amounts:

| NAME OF HOLDER | AMERICAN FOAM SERIES A DEBENTURE DUE MAY 1, 1960 | AMERICAN FOAM SERIES B DEBENTURE DUE MAY 1, 1965 [3] | BURLINGTON DEBENTURE DUE APRIL 1, 1960 |
|---|---|---|---|
| SAMUEL BUCHMAN | $48,000 | $64,000 | $12,000 |
| MARIE LOUISE de-MONTMOLLIN | 63,000 | 79,000 | 15,000 |
| ALEXANDER F. PATHY | -0- | 80,000 | -0- |

To induce Samuel Buchman to sell his capital stock hereunder, Marie Louise deMontmollin and Alexander F. Pathy hereby agree with respect to the debentures of each of said corporations that the rights of any holder (including her or him) of the debentures thereof now held by her or him and referred to above, be subordinated to the rights of any holder or holders of the debentures thereof now held by Samuel Buchman (including him) as to the payment of interest and principal. No claim for interest under the debentures so subordinated shall be made unless all interest payable on the debentures now held by Samuel Buchman shall have been paid in full, and no claim for principal under any of the debentures so subordinated shall be made unless the entire principal of all the debentures now held by Samuel Buchman shall have been paid in full.

If for any reason, either corporation shall pay interest or principal on said

1. Burlington became a wholly-owned subsidiary of AFR on April 30, 1958.

2. Under the terms of the Buy-Sell Agreement, Buchman's son, A. Sander Buchman, also sold his entire stock interest in AFR to the individual defendants.

3. "Due May 1, 1965" should read "Due August 1, 1965." See Exhibit 37 and the trial transcript at page 15.

debentures to any of the Buyers, or to any person deriving title to the debentures of said corporation from any of the Buyers, and said payment shall be made without first satisfying the priority to which the holder or holders of Samuel Buchman's debentures are entitled by reason of the foregoing provisions, the amount or amounts of the payment so made to the Buyer (or to the person deriving title from her or him) shall be promptly paid by such Buyer to said holder or holders of Samuel Buchman's debentures. Any payment made on account of principal shall be endorsed on said debentures, which shall be submitted to the payor for that purposes.

On June 1, 1957, Pathy sold his Series B AFR debentures to deMontmollin for $80,000 and received such amount from her in payment thereof. (PTO 39.) [4]

In April 1958, "the individual defendants in their capacities as officers, directors and stockholders of AFR caused the certificate of incorporation of AFR to be amended so as to provide for 3,500 shares of 5% cumulative preferred stock of the par value of $100 each * * *." (PTO 40.) At a special meeting of AFR's Board of Directors held on April 23, 1958, it was resolved that shares of the new 5% cumulative preferred stock be issued in exchange for AFR Series A and Series B debentures and 5% promissory notes surrendered to the corporation at the rate of one share of stock for each $100 face amount of said debentures and notes. (EX.FD.) [5]

In May 1958, deMontmollin surrendered AFR debentures and notes owned by her in the aggregate face amount of $291,000 to AFR and received in exchange therefor 2,910 shares of preferred stock. In December 1959, deMontmollin surrendered additional AFR debentures and notes in the total face amount of $31,000, which she owned, and received in exchange 310 shares of preferred stock. (PTO 40.)

On April 1, 1960, the Burlington debentures held by Buchman and deMontmollin became due. Buchman was paid the interest and $12,000 principal owing on his Burlington debentures on or about their due date. (PTO 38.) deMontmollin's Burlington debentures in the amount of $15,000 were also discharged and she received a credit for that amount on Burlington's books. She then loaned this same $15,000 to AFR, then the parent company of Burlington, and received a note from AFR in that amount.

Buchman was paid the interest and principal amount owing on his Series A AFR debentures on or about their due date, May 1, 1960. (PTO 38.)

On January 17, 1961, AFR filed a voluntary petition for an arrangement under Chapter XI of the Bankruptcy Act and was duly adjudged a bankrupt on February 21, 1961. A Trustee in Bankruptcy was appointed on February 23, 1961. (PTO 2 and 3.) The Trustee has insufficient assets in his hands to pay in full the liabilities of said bankrupt. (PTO 5.)

While Buchman was paid interest on his Series B AFR debentures until and including August 1, 1960, he has been paid neither any part of the $64,000 principal nor any interest thereon falling due after August 1, 1960. AFR's Series B debentures were due on August 1, 1965. (EX. 37.)

Claiming breach of the subordination provisions of the Buy-Sell Agreement, Buchman instituted suit against the individual defendants in June 1960. (Buchman died on November 4, 1965 whereupon plaintiffs herein were duly appointed executors of his estate.) Jurisdiction is based upon diversity of citizenship. The complaint, as amended

---

4. "PTO" followed by a number refers to paragraphs of the Pre-Trial Order dated March 15, 1968.

5. "EX." followed by a number or letters refers to exhibits in evidence.
"Tr." followed by a number refers to pages of the trial transcript.

by the Pre-Trial Order, asserts that each of the three transactions enumerated above, to wit, the sale of Pathy's Series B AFR debentures to deMontmollin, the exchange of deMontmollin's AFR debentures for preferred stock, and the discharge of deMontmollin's Burlington debentures and loan by her of $15,000 to AFR, constituted a breach of the subordination provisions. Relief is sought against the individual defendants, jointly and severally, in the amount of $64,000 with interest from June 1, 1957.

The issue confronting this Court, as framed in the Pre-Trial Order, is rather simply stated: "Did the individual defendants by their actions and conduct breach the subordination provisions of the May 17, 1957 agreement [Buy-Sell Agreement] entered into by them with Samuel Buchman?" (PTO VIII (a).) It is to a closer look at each of the transactions in question that we now turn.[6]

*The Sale Transaction*

On June 1, 1957, Pathy sold his Series B AFR debentures to deMontmollin receiving $80,000 from her in payment thereof. Plaintiffs contend that this transfer of debentures constituted a breach of the subordination provisions of the Buy-Sell Agreement.

In an attempt to establish such breach, plaintiffs have endeavored to draw a distinction between the second and third paragraphs of subparagraph A of the SIXTH paragraph of the Buy-Sell Agreement. Plaintiffs argue that while the third paragraph covers only payments received from the corporations on the debentures, the second paragraph is not so restricted in terms of "source of payment." Relying on this presumed distinction, they contend that the proceeds of the sale should have been used to reduce the amounts owing on Buchman's debentures.[7]

This argument is rebutted by the unambiguous language of the subordination provisions themselves. The clear purport of those provisions was to prohibit the individual defendants from receiving any payment of principal or interest *from the corporations* on their debentures until Buchman's debentures had been satisfied in full. Payment, upon sale and transfer of the debentures, from a source other than the corporations (here deMontmollin) was not prohibited by the provisions in question.

It is equally clear from the language employed that the possibility of future transfer of the debentures was recognized and permitted by the parties. The subordination provisions contemplated the possibility of holders of the debentures other than Pathy and deMontmollin and expressly provided for subordination of the debentures in the hands of "any holder."[8]

6. During the course of the trial, decision was reserved on a number of evidentiary rulings. We now proceed to dispose of them: individual defendants' motion to strike Exhibit 34 is denied; individual defendants' objections to Exhibits 39, 41 and 42 for identification are overruled and those exhibits are admitted in evidence; plaintiffs' motion to strike Exhibit ES is denied; plaintiffs' objections to Exhibits EV, EW, EX and EY for identification are sustained; plaintiffs' objection to Exhibit EZ for identification is overruled and that exhibit is admitted in evidence. Decision was also reserved on individual defendants' motion to dismiss made at the end of plaintiffs' case. That motion is hereby denied.

7. Plaintiffs' Memorandum Submitted At The Conclusion Of The Trial, p. 6.

8. The subordination provisions in part provided: " * * * Marie Louise deMontmollin and Alexander F. Pathy hereby agree with respect to the debentures of each of said corporations that the rights of any holder (including her or him) of the debentures thereof now held by her or him * * *;" and "[i]f for any reason, either corporation shall pay interest or principal on said debentures to any of the Buyers or to any person deriving title to the debentures of said corporation from any of the Buyers * * *." (EX. 40.) Individual defendants assert that "it is inconceivable that the parties would have written into the Agreement the phrase 'any holder (including her or him)' if the Agreement forbade there being any holder other than 'her or him.'" (Individual

■ Pathy's sale of his Series B AFR debentures to deMontmollin did not breach the subordination provisions of the Buy-Sell Agreement; his debentures (now owned by deMontmollin) remained subordinated to the debentures held by Buchman.[9]

We recognize that the transfer of Pathy's debentures may have violated the terms of the Subordination Agreement (Exhibit EN–1) entered into between The Pennsylvania Company for Banking and Trusts (hereinafter the Pennsylvania Bank), AFR, and Buchman, Pathy and deMontmollin.[10] Breach, if any, of that agreement, however, is not the issue presently confronting us; the Pennsylvania Bank is not a party to the instant suit. Our concern rather is with an entirely separate agreement, the terms of which vary widely from those of Exhibit EN–1. Paragraph 9 of that exhibit, *supra* note 10, typifies language used where transfer of the subordinated debt is sought to be prohibited. The subordination provisions of the Buy-Sell Agreement, however, contain no similar prohibition on transfer; to the contrary, as previously discussed, they allow it.

### The Exchange Transaction

In May 1958 and December 1959, deMontmollin surrendered debentures and promissory notes aggregating $322,000 [11] to AFR and received 3,220 shares of preferred stock in exchange therefor. Did this conversion of subordinated debt into equity violate the subordination provisions of the Buy-Sell Agreement? Resolution of this novel issue requires an understanding of the nature and effect of the subordination provisions and of the relationship created by them between Buchman (the senior creditor [12]) and the individual defendants (the junior creditors).[13]

The subordination provisions had two principal effects. First, as already discussed, the individual defendants were expressly prohibited from receiving any payment of interest or principal from the corporations on their debentures until all of Buchman's debentures had been

Defendants' Memorandum After Trial, p. 50.) We fully agree.

9. See Calligar, Subordination Agreements, 70 Yale L.J. 376, 399 (1961).

10. Paragraph 9 of that Agreement provided: "Creditors [Buchman, Pathy, and deMontmollin] agree that so long as there remains any Indebtedness of Borrower to Bank, Creditors will not assign or transfer any of Borrower's Indebtedness to Creditors or any instrument evidencing the same, and in the event of any such assignment or transfer the Creditor so assigning or transferring shall thereupon immediately become liable to Bank in the amount of the Indebtedness so assigned or transferred."
There is absolutely nothing in the Buy-Sell Agreement which even intimates that the parties intended to have this prohibition on transfer become a part of their agreement. Further, the two agreements were not co-extensive in duration.

11. Individual defendants state that "[i]n and by the exchange, debts of the COMPANY aggregating $300,000, owed to Mrs. deMontmollin, were turned into equity investments. $231,000 of the $300,000 was represented by debentures which were subordinated to BUCHMAN'S debentures. $69,000 was represented by notes * * *." (Individual Defendants' Memorandum After Trial, p. 23.) While these figures are inaccurate (the debts of the corporation converted into preferred stock aggregated $322,000 (PTO 40); the subordinated debentures converted could not possibly have totaled $231,000 since, with the exclusion of deMontmollin's Burlington debentures which were not converted, the AFR debentures subordinated to Buchman's debentures only totaled $222,000), we feel safe in assuming that deMontmollin converted all of her Series A and B AFR debentures (inclusive of those she acquired from Pathy) which were subordinated to Buchman's debentures.

12. "Senior creditor" refers to the holder of the senior debt. "Junior creditor" refers to the subordinator or the holder of the subordinated debt.

13. Pathy held no subordinated debentures at the time of the exchange. His Series B debentures which were sold to deMontmollin in June 1957 were exchanged by her for preferred stock.

fully satisfied. This prohibition ensured that the corporations' assets would not be reduced by payments on the subordinated debts until Buchman's debentures had been fully paid. If any payments of interest or principal were received by the individual defendants before Buchman's debentures were fully satisfied, such amounts, by the terms of the subordination, were to be promptly paid to Buchman. This type of agreement, under the terms of which "no payment of principal or interest on the subordinated debt is permitted * * * so long as specifically identified senior debt remains unpaid," is commonly referred to as a "complete" subordination.[14]

Second, while subordination "suggests a mere ranking of priority, upon the insolvency of the common debtor the amounts otherwise payable on the junior creditors claim will in the usual subordination situation be payable to the senior creditor."[15] Thus, subordination has "the practical effect of making the subordinated debt a type of security for the senior debt, available to the senior creditor upon a distribution of the assets of the debtor."[16] Stated another way, the subordinated debt has a "collateral value" to the senior creditor in the event of the common debtor's insolvency which justifies his regarding it as a "cushion" or "support" for his senior debt.[17] Whether a junior creditor (here deMontmollin) could extinguish this so-called "security" or "cushion" without breaching the subordination provisions is an issue we reserve for later discussion.

Much of the trial record [18] concerns itself with the conflicting positions taken by the parties on the meaning of the word "payment" found in the subordination provisions. Plaintiffs, contending that "payment" means "the transfer of consideration which discharges a debt,"[19] argue that deMontmollin's receipt of preferred stock in exchange for her debentures constituted "payment" of those debentures. The individual defendants, on the other hand, assert that "payment," as used in the subordination provisions, contemplated only payment with assets of the corporation; since no assets of the corporation were expended in discharging the debentures, they argue no "payment" was received. We agree with the position of the individual defendants.

▆▆ While the exchange resulted in the discharge of the debentures as legal obligations of the corporation, the receipt of preferred stock in place thereof did not constitute "payment" (of interest or principal) as that term was used in the

14. Calligar, *supra* note 9, at 378. See also Coogan, Kripke, and Weiss, The Outer Fringes of Article 9: Subordination Agreements, Security Interests In Money And Deposits, Negative Pledge Clauses, And Participation Agreements, 79 Harv. L.Rev. 229, 234 (1965); 2 Gilmore, Security Interests in Personal Property § 37.1 at 986 (1965).

15. Coogan, Kripke, and Weiss, *supra* note 14, at 236 n. 25.

16. Calligar, *supra* note 9, at 378.

17. Golin, Debt Subordination As A Working Tool, 7 N.Y.L.F. 370, 379 (1961); Everett, Subordinated Debt-Nature, Objectives and Enforcement, 44 Boston Univ.L.Rev. 487, 524 (1964); Coogan, Kripke and Weiss, *supra* note 14, at 236 n. 25. One commentator has stated that "[t]he [senior] creditor is advantaged by obtaining, either specifically for itself or generally with other creditors, a collateralized position and a resulting superi-

or right of distribution to the debtor's assets." Golin, *supra* at 379. See also 2 Gilmore, *supra* note 14, § 37.1 at 985–86.

18. Pathy was the only witness to testify at trial.

19. Plaintiffs' Memorandum Submitted At The Conclusion Of The Trial, p. 12. Plaintiffs place much reliance on the fact that Pathy understood the word "payment"—as used in the last resolution of Exhibit 33—to mean "legal discharge." (Tr. 171.) The meaning attributed to "payment" when used in a different context and outside of the subordination provisions, is not controlling. We note, however, that the indebtedness of the corporation was "legally discharged" in and by the exchange. As will be explained, this does not mean that "payment," as that was used in the subordination provisions, was received on the debentures.

subordination provisions.[20] The clear intent of those provisions was to prohibit any payment *out of the assets of the corporations* on the individual defendants' debentures before Buchman's debentures were paid in full. No assets of AFR were paid out in discharging deMontmollin's debentures. The exchange did not affect the asset side of the corporation's balance sheet; only the liabilities and capital side was affected, i. e. long-term debt was converted into capital.[21]

In this Court's memorandum of May 9, 1967, denying individual defendants' first summary judgment motion,[22] we noted that the possibility that the exchange was "a first step in a plan to obtain cash—or cash realizable property—from the corporations" had not been excluded. In an effort to disprove the existence of such a plan, individual defendants sought to establish at trial that the prime objective of the exchange was to obtain a higher credit rating from Dun & Bradstreet and other rating companies, and thereby increase the credit capacity and borrowing power of AFR. (Tr. 272–73.)

We need not determine whether the existence of such a plan (although never fully consummated) would constitute a breach of the subordination provisions since we are convinced that the exchange was not a first step in a plan by which the individual defendants, or any one of them, would obtain cash or its equivalent from the corporation. In fact, an examination of deMontmollin's status as a holder of preferred stock indicates that it was highly improbable that she would realize any cash or its equivalent out of the assets of AFR by means of the exchange.

The stock acquired through the exchange was five per cent (5%) cumulative preferred stock which was redeemable at any time by the corporation. (EX. EO.) As detailed below, AFR, however, was effectively precluded (at all times with which we are here concerned) from either paying dividends on, or redeeming any shares of, the preferred stock.

Each AFR Series B debenture provided for the payment of interest at the rate of five per cent (5%) per annum and for the payment on each interest payment date (commencing February 1, 1956) of five per cent (5%) of the respective principal amount thereof.[23] AFR agreed that "as long as any past due instalments of principal remain unpaid it will not declare any dividends upon any class of its capital stock * * *." (EX. 37, ¶ 5.)

The corporation never paid any portion of the principal amount owing on Buchman's Series B debentures. (PTO 38.) In fact, until some time in 1959 when Walter E. Heller & Co. replaced the Pennsylvania Bank as the main source of financing for the corporation, AFR was prohibited by the terms of the Subordination Agreement with the Pennsylvania Bank[24] from making any payments on account of principal on its Series B debentures.[25] (EX. EN–1, ¶ 8.) Accordingly, no dividends could be declared on the preferred stock since no

20. *Cf.* McConnell v. Estate of Butler, 402 F.2d 362, 366 (9th Cir. 1968).

21. See EXs. EP and EQ.

22. We denied individual defendants' second summary judgment motion on August 13, 1968.

23. AFR was not "required to make any payment on account of principal if the undersigned has not accumulated earnings and profits at least sufficient in amount to provide for that payment." (EX. 37, ¶ 5).

24. The parties to the instant litigation were also parties to that subordination agreement under the terms of which they agreed to subordinate their Series B debentures to AFR's indebtedness to the Pennsylvania Bank. (EX. EN–1.) See also subparagraph C of the SIXTH paragraph of the Buy-Sell Agreement. (EX. 40.)

25. AFR was permitted to make payments of interest (not in excess of 5% per annum) on the debenture bonds. (EX. EN–1, ¶ 12.)

instalments of principal were paid on Buchman's Series B debentures.

Redemption of the preferred shares was prohibited by the very terms of the Buy-Sell Agreement:

> To induce the sale of capital stock hereunder, the Buyers warrant and agree that, until the entire purchase price hereunder shall have been paid in full and until all the debentures and the Promissory Note now held by Samuel Buchman (which are described in paragraph SIXTH hereof) shall have been paid in full, neither American Foam nor Burlington will redeem or purchase any of its capital stock or make any distribution to its stockholders in the nature of a liquidation or partial liquidation * * *.

(EX. 40, EIGHTH paragraph.) Additionally, while the Term Loan Agreement with the Pennsylvania Bank (Exhibit EN) remained in effect,[26] AFR had to refrain from purchasing or redeeming any of its capital stock or that of any of its subsidiaries "if the aggregate consideration for all of such purchases and redemptions exceeds $10,000 in money or property." (EX. EN, § 4.11.)

■ It is clear from the foregoing that AFR could not redeem or purchase any of the shares of preferred stock issued to deMontmollin in exchange for her debentures. Further, no dividend payments could be made on said shares unless and until all past due instalments of principal on the outstanding Series B debentures were paid. Under such circumstances, we cannot comprehend the exchange as a first step in a plan to obtain cash or its equivalent from AFR.

*Dividends Paid on Subordinated Debt*

While the exchange transaction did not result in deMontmollin receiving "payment" (as that term was used in the subordination provisions) of interest or principal on her debentures, it did have the adverse affect of depriving Buchman, and now his executors (the plaintiffs herein), of a "double dividend"[27] out of AFR's bankrupt estate— i. e. the dividends paid on the senior debt and, by reason of the subordination provisions, the dividends paid on the subordinated debt. The following example illustrates why, from the point of view of the senior creditor, subordinated debt is preferable to equity:

> [A]ssume that a bankrupt company has $600,000 of assets and has outstanding $500,000 of senior debt, $500,000 of subordinated debt, and $500,000 of other debt. On a distribution of all the assets of the company the senior debt would receive $400,000—the $200,000 dividend paid on the senior debt plus the $200,000 dividend paid on the subordinated debt—and the other debt would receive $200,000. If the subordinated debt had been preferred stock, however, the senior debt would have received only $300,000, with the remaining $300,000 being paid on the other debt.[28]

Individual defendants are mistaken in arguing "[i]f nothing is paid out of assets it is of no consequence to the favored creditor that the subordinated debt is wiped out."[29] Buchman's "security" or "cushion" for his senior debt was lost when the subordinated debt was "wiped out." The exchange affected Buchman in the same way that a discharge of the subordinated debt by waiver, forgiveness, or cancellation would have, namely, he was deprived of the dividend—the junior creditor's (here deMontmollin's) dividend—on the subordinated debt.

Subordination agreements have long been upheld by the courts. In bank-

---

26. Burlington was also a signatory to that agreement.

27. Calligar, *supra* note 9, at 377; 2 Gilmore, *supra* note 14, § 37.1 at 985.

28. Calligar, *supra* note 9, at 377.

29. Individal Defendants' Memorandum After Trial, p. 41.

ruptcy proceedings, the terms of subordination have been enforced with the result that the dividends paid on the subordinated debt are allocated to the senior debt.[30] This has been so despite the absence of any reference in the subordination agreements to bankruptcy proceedings.[31] Accordingly, had deMontmollin remained a creditor of AFR, the dividends paid out of the bankrupt estate on her subordinated claims would have been allocated to Buchman's senior debt.

DeMontmollin, however, did not retain her junior creditor status; rather, through the exchange she became a stockholder of AFR thereby subordinating her claim against the corporation to the claims of all creditors. The "security" of a "double dividend" in the event of bankruptcy was lost to Buchman.

Did deMontmollin breach the subordination provisions when she altered her status from one of junior creditor to that of preferred stockholder? Was she prohibited by the terms of the subordination from discharging the subordinated debt?

Individual defendants, citing no authority, vigorously contend that it is "preposterous" to believe that subordination forbids discharging ("wiping out") the subordinated debt.[32] We must disagree. The authority that exists, scant though it may be, points convincingly in the opposite direction.

In *In re Dodge-Freedman Poultry Co.*,[33] Freedman, the president, director, and principal stockholder of Dodge-Freedman Poultry Company, in consideration for credit extended by Delaware Mills to the Poultry Company, agreed to subordinate all of his claims against the Poultry Company (totaling $50,000) to the debt owed by the Poultry Company to Delaware Mills, and further agreed that no payments would be made to him until all amounts owing to Delaware Mills had been paid. In 1955 the Poultry Company filed a petition for an arrangement under Chapter XI of the Bankruptcy Act. A Plan of Arrangement was subsequently adopted providing for payment of a fifteen per cent (15%) dividend to all unsecured creditors in full satisfaction of their claims. One such unsecured claim was the $50,000 owing to Freedman; by the terms of the Arrangement, he was entitled to receive a dividend of $7,500 on his claim. Before payment, however, Freedman waived all rights to share in any dividend under the plan.[34]

Delaware Mills, having received a 15% dividend on its own claim, filed another proof of claim asserting its right to an additional dividend of $7,500 (the dividend Freedman would have received had he not waived his claim) by virtue of the subordination agreement.

The court, in upholding Delaware Mills' right to Freedman's dividend, made the following pertinent observations:

> The forbearance agreement prevented him [Freedman] from collecting and retaining any money on his own behalf so long as Delaware's claim had not been satisfied up to the agreed sum. As a result, it might

---

30. Subordination Agreements have been enforced on a variety of theories. See 2 Coogan, Hogan, Vagts, Secured Transactions under U.C.C. § 23.02 [3] at 2352 n. 21; Calligar, *supra* note 9, at 383–92.

31. See In re Credit Industrial Corp., 366 F.2d 402, 412 (2d Cir. 1966). Cf. In re Aktiebolaget Kreuger & Toll, 96 F.2d 768, 770 (2d Cir. 1938).

32. Individual Defendants' Reply Memorandum, p. 13.

33. 148 F.Supp. 647 (D.N.H.1956), aff'd sub nom., Dodge-Freedman Poultry Co. v. Delaware Mills, Inc., 244 F.2d 314 (1st Cir. 1957).

34. The $50,000 claim was both proved and waived by Mrs. Freedman. For purposes of the proceeding, however, it was agreed to consider the claim filed and waived by her as being a claim of Freedman.

seem that Freedman was actually fulfilling his contract when he waived all rights, because he was, in effect, forbearing. But equity will regard the substance rather than the form of every agreement and examine its purpose and intent. [citation omitted.] Applying this principle to the contract, it is obvious from its language that its intent and purpose was that Delaware's claim would be 'satisfied and paid.' Therefore, by looking behind the mere formality of forbearance, equity can take cognizance of the fact that Freedman, to a limited extent, undertook to assure payment of Delaware's claim up to $50,000. Although it is true that Freedman had no duties to perform other than to forbear, he is, at the very least, barred by the spirit of the agreement from taking any action that might prevent the satisfaction of Delaware's claim. By waiving his right to a dividend, Freedman is doing just that. He is returning the money to the debtor against whom Delaware Mills has no further rights since it has already accepted its full, legal share under the *Plan of Arrangement*. Thus Freedman was estopped from waiving his claim, for to do so violates the intent and purpose behind the agreement.[35]

The court went on to enforce the subordination agreement by holding Freedman to be a "constructive trustee" for Delaware Mills.

The facts of our own case are in some respects quite similar to those in *Dodge-Freedman*. Here we have a sit-uation where a junior creditor, who was a principal stockholder, director and officer of the common debtor, through the expedient of the exchange transaction, discharged the subordinated debt. There apparently was no way for Buchman, at the time he entered into the Buy-Sell Agreement, to anticipate this happening. This is not a case where a senior creditor should have been cognizant of the consequences of debenture provisions allowing conversion of the subordinated debt into capital stock. AFR's Series A and B debentures contained no provisions permitting conversion (at the option of the holder) into capital stock.[36] Conversion became possible only after the individual defendants in their capacities as officers, directors and stockholders of AFR caused the certificate of incorporation to be amended to provide for preferred stock, and thereafter passed the resolution allowing preferred shares to be issued in exchange for Series A and B debentures surrendered to the corporation. (EX. FD.)

We note that our problem presents an aspect which differs from that confronting the court in *Dodge-Freedman*. Here the subordinated debt was discharged considerably before the filing of AFR's voluntary petition for an arrangement under the Bankruptcy Act.[37] This distinction notwithstanding, we believe that the reasoning which estopped Freedman from waiving his dividend is fully applicable here.[38] It matters not that the subordinated debt was discharged before bankruptcy rather than after; the effect on the senior creditor, i. e., loss of the dividend on the sub-

35. In re Dodge-Freedman Poultry Co., *supra* note 33, at 651.

36. We have not been informed of the provisions of AFR's Series A debentures. We assume, from the silence of the parties, that they, like the Series B debentures, contained no provision permitting conversion into capital stock.

37. The exchange of debentures for stock took place in May 1958 and December 1959. AFR filed a voluntary petition under Chapter XI of the Bankruptcy Act on January 17, 1961. The Corporation was adjudged a bankrupt in February, 1961.

38. While relying on that portion of the court's reasoning previously set out in the body of this opinion, we recognize the inapplicability of the constructive trust theory to the facts of this case. See Cherno v. Dutch American Mercantile Corp., 353 F.2d 147, 154 (2d Cir. 1965).

ordinated debt, is identical in both cases.[39]

In Cherno v. Dutch American Mercantile Corp.,[40] Blanmill Realty Corp., in consideration for Dutch American loaning Itemlab, Inc., $50,000 on Itemlab's note in that amount, agreed that its claim against Itemlab for $87,000, evidenced by a note and secured by a chattel mortgage, " 'shall * * * be subject and subordinate in lien to the lien of said note for $50,000,' and that 'no part of the indebtedness * * * shall be paid [to Blanmill] until all sums due and owing to Dutch American Mercantile Corp. shall have been paid and disposed of.' "[41]

Itemlab defaulted on its note to Dutch American, and the latter commenced an action to recover the amout due. While that case was pending, Blanmill "executed and filed a satisfaction of the chattel mortgage in spite of the fact that no part of the mortgage debt had ever been paid."[42] An innocent third party, relying on such discharge, thereafter loaned funds to Itemlab on the security of the same chattels. Upon Itemlab's bankruptcy the chattels were sold and Dutch American claimed the proceeds of the sale. The court denied Dutch American's claim to the proceeds holding that the subordination agreement did not result in an equitable assignment of the subordinated debt or the chattel mortgage.[43] The court also rejected the assertion that an equitable lien on, or constructive trust of,[44] the chattels or their proceeds resulted from the subordination.

The importance of this case for present purposes arises from the following statement by the court:

Dutch American at no time had an interest in or lien upon the chattels. Its so-called "security" was nothing more than a promise by Blanmill to apply no payment against the mortgage debt until Dutch American was paid in full. *Blanmill breached that agreement,* but breach of a contract concerning payment of a debt furnishes no basis for the finding of a constructive trust. [citation omitted.] Dutch American could enforce the obligation against Blanmill and Itemlab as parties to the subordination agreement but not against other existing or subsequent creditors. (Emphasis supplied.)[45]

The court's statement that Blanmill breached the subordination agreement could only have reference to its discharge of the chattel mortgage.[46] We interpret the court as saying that the junior creditor's discharge of the chattel mortgage securing the subordinated debt constituted a breach of the subor-

39. "In light of the attempt made by the subordinator in *Dodge-Freedman* to escape the consequences of his subordination," one commentator has suggested that "it might be well to insert in future subordination agreements a provision prohibiting waiver, forgiveness, or cancellation of the subordinated debt." Calligar, *supra* note 9, at 387–88.

40. 353 F.2d 147 (2d Cir. 1965).

41. 353 F.2d at 149.

42. *Id.*

43. The court further held that even if an assignment did result, the law of New York required that it be recorded to be effective against third parties.

44. While the court rejected Dutch American's claim to the proceeds of the chattels, it did hold that "if, at the conclusion of the bankruptcy proceedings in Itemlab, Inc., debtor, liquidation had been accomplished and a distributive dividend were ordered to Blanmill and Dutch American, as creditors, Dutch American, on the theory of contructive trust, could, to the extent of its claim, receive Blanmill's dividend under the subordination agreement and prevent Blanmill from taking it and using it for its own purposes." 353 F.2d at 154.

45. 353 F.2d at 154.

46. No part of the debt which the mortgage was intended to secure was paid.

dination agreement.[47] If this is so, and we have no reason to doubt that it is, then discharge of the subordinated debt itself most certainly constitutes a breach of the subordination.

The foregoing authorities convince us that deMontmollin's discharge of her Series A and B AFR debentures by means of their exchange for preferred stock constituted a breach of the subordination provisions of the Buy-Sell Agreement. Buchman's contemplated right to the dividend which would have been paid on the subordinated debt, had it not been discharged, was lost by virtue of the exchange. The absence of any express reference in the subordination provisions to either distributive dividends or bankruptcy is not controlling.[48] Implicit in the language used is the intent of the parties that Buchman have the "security"[49] of the subordinated debt in the event of the common debtor's bankruptcy. This "security" was lost to Buchman just as it was lost to Dutch American in *Cherno*[50] and almost lost to Delaware Mills in *Dodge-Freedman*. At the very least, deMontmollin was barred by the terms of the subordination from taking any action that might prevent satisfaction of Buchman's claim.[51] Her exchange of debentures for preferred stock had just that effect.

Leading commentators have devoted considerable energy to the question: "Does a subordination create an article 9 security interest against the junior creditor and in favor of the senior creditor?"[52] The answer to this question becomes important in situations where both the common debtor and the junior creditor have gone bankrupt[53] since there the issue of priority between the senior creditor and the junior creditor's trustee in bankruptcy is a very real one.[54] We are not here faced with such a dilemma (plaintiffs seek only to recover against a junior creditor for her breach of the subordination provisions of the Buy-Sell

---

47. It is significant to note that in the converse situation, i. e. release by a senior creditor of collateral security held for the senior debt, the junior creditor would be adversely affected.

"To the extent that such collateral is not available to the senior creditor in the event of the bankruptcy of the debtor, dividends on the subordinated debt must be used in making the senior creditor whole. In other words, by giving up his collateral, the senior creditor makes it more likely that if the debtor goes bankrupt, the senior creditor will have to satisfy the obligation owed him by taking the junior creditor's dividends. It would therefore follow, in the absence of a provision permitting the senior creditor to alter the terms of the debt or deal with the security therefor that the senior creditor might be obliged to some extent to the subordinating creditor as to the value of the collateral released." Calligar, *supra* note 9, at 530–31.

Professor Gilmore has stated: "No doubt release or impairment of collateral by a secured senior should pro tanto release the unsecured subordinator from his duties under the subordination agreement just as it would release a surety." 2 Gilmore, *supra* note 14, § 37.1 at 985–86 n. 10.

48. See cases cited in note 31, *supra*.

49. The "security" that comes from the senior creditor's right to the distributive dividend paid on the subordinated debt.

50. Dutch American did not lose all its "security" since Blanmill still held Itemlab's note for $87,000. See note 44, *supra*.

51. A subordinator has been referred to as "a guarantor to the extent of the value of the subordinated debt." Calligar, *supra* note 9, at 394. But see Golin, *supra* note 17, at 371, where issue is taken with this characterization.

52. Coogan, Kripke and Weiss, *supra* note 14, at 236. See also 2 Coogan, Hogan, Vagts, *supra* note 30, ch. 23; 2 Gilmore, *supra* note 14, § 37.3 at 994.

53. See Pioneer-Cafeteria Feeds, Ltd. v. Mack, 340 F.2d 719 (6th Cir. 1965).

54. If the senior creditor has acquired a security interest, and it does not meet the enforcement and perfection requirements of Article 9 of the Uniform Commercial Code, "it is not good against the junior creditor's trustee in bankruptcy." Coogan, Kripke and Weiss, *supra* note 14, at 235.

Agreement), and accordingly intimate no view on the "true nature" of the interest created, if any, in favor of a senior creditor by virtue of a subordination agreement. We hold only that where a subordination agreement is in effect, in the absence of provisions to the contrary, it is a breach of that agreement for a junior creditor to discharge the subordinated debt as was done here.

### The Loan Transaction

On April 1, 1960, deMontmollin's Burlington debentures aggregating $15,000 became due and payable. At some point (apparently in April) she surrendered these debentures to Burlington and received a credit for $15,000 on Burlington's Books. (Tr. 24.) [55] DeMontmollin then proceeded to loan this same $15,000 to AFR and received a note [56] from AFR in that amount.[57]

■ This series of "bookkeeping entries" had four principal effects: first, deMontmollin's Burlington debentures were discharged; [58] second, the assets of Burlington were reduced by $15,000—the amount loaned by deMontmollin to AFR; [59] third, the assets of AFR were increased by $15,000; and fourth, deMontmollin became a note holder of AFR for the amount of the loan.[60] Viewed with these effects in mind, it becomes apparent that the loan transaction resulted in deMontmollin receiving "payment" on her Burlington debentures.

While deMontmollin did not "physically" receive cash (or its equivalent) from Burlington, she did receive a credit on Burlington's books for $15,000 which amount she then chose to loan to AFR. Certainly the fact that the funds did not "physically" pass through her hands on their way to AFR is not controlling. The effects of the transaction would have been exactly the same had she had Burlington pay her the $15,000 before she loaned it to AFR.

Clearly deMontmollin cannot get around the subordination provisions' prohibition on "payment" of her debentures by the series of "bookkeeping entries" involved here.[61] Her realization of "pay-

---

55. DeMontmollin could draw against those funds from the time of credit to her account. (Tr. 26.)

56. Exhibit 36 states: "The loans [including deMontmollin's] are represented by 6% notes maturing on Decemer 30, 1960. Interest thereon has been paid through December 31, 1960."

57. Pathy described the transaction in question as follows:
    "[I]n April of 1960, Mrs. deMontmollin, who was supposed to receive $15,000 on her A bond Burlington debentures did not receive $15,000 on those bonds, but loaned those $15,000 to AFR." (Tr. 161.)
    "She had Burlington Holding bonds or debentures which matured in April of 1960. By that time Burlington was a subsidiary of American Foam. The same amount of $150,000 [sic] which were [sic] supposed to be paid to her but were [sic] not paid, were [sic] loaned by her to AFR and therefore it became a loan of an officer to AFR." (Tr. 173)

58. The debentures ceased to be obligations of the corporation and the principal amount owing on them was credited to

deMontmollin's account on Burlington's books. Burlington still owed deMontmollin $15,000 (evidenced by the credit to her account) but not by virtue of the debentures.

59. It is undisputed that the $15,000 loaned to AFR was the same $15,000 payable on the Burlington debentures. The $15,000 credit to deMontmollin's account must have been extinguished by her loan of those funds to AFR. This debit to her account must have been accompanied by a corresponding credit to Burlington's cash account.

60. Counsel for individual defendants, during the course of the trial, stated that "the $15,000 note which was taken by Mrs. deMontmollin in April 1960 and which was never paid, was assigned to an attorney, and that is a claim in the bankruptcy proceeding." (Tr. 50.)

61. We cannot accept Pathy's oversimplified characterization of the transaction as simply a "bookkeeping device by virtue of which the indebtedness of the subsidiary [Burlington] became the indebtedness of the parent Co. [AFR]" without any amount being paid to deMontmollin. (Tr. 173, and 257.)

ment" in the amount of $15,000 on her Burlington debentures is attested to by the fact that she loaned these very funds to AFR.[62]

We hold that the loan transaction resulted in deMontmollin receiving "payment" of $15,000 on her Burlington debentures. By the terms of the subordination, she was required to promptly pay that amount over to Buchman. In failing to do so, she breached the subordination provisions of the Buy-Sell Agreement.

### Damages

Before turning to the matter of damages, one preliminary point warrants attention. Plaintiffs seek to recover against the individual defendants "jointly and severally." No reason is assigned, however, why breach of the agreement by any one of the individual defendants should result in liability being imposed "jointly" on all of them. There is nothing in the Buy-Sell Agreement indicating that the individual defendants agreed to be "jointly" responsible for any breach of the subordination provisions.[63] It appears not to have been their intent to enter into a joint agreement with respect to subordination. Rather, each agreed to subordinate his or her own debentures to those debentures held by Buchman. The agreement was several not joint.

■ There is nothing before us to warrant the imposition of liability on Suzanne M. Pathy and Alexander F. Pathy. The former was not herself a

subordinator, and the latter, while a holder of subordinated debt,[64] never breached the subordination provisions.[65] Only de Montmollin breached those provisions—only to the extent hereinabove discussed—and, accordingly, only she is liable to plaintiffs for the damages sustained by Buchman.

Both the exchange and loan transactions have been found to breach the subordination provisions of the Buy-Sell Agreement; the amount of damages resulting therefrom is the only issue remaining for determination.

Plaintiffs, without any specificity or breakdown of any sort, assert that they are entitled to $64,000 with interest from June 1, 1957. Individual defendants, on the other hand, contend that even if the subordination provisions were breached, "Buchman suffered no damage therefrom."[66] Both are wrong.

■ Buchman was certainly damaged when deMontmollin, in breach of the subordination provisions, failed to turn over the $15,000 she realized on her Burlington debentures. Accordingly, plaintiffs are entitled to recover that amount plus interest thereon from the date of such breach.

■ The damage resulting from deMontmollin's exchange of her AFR debentures for preferred stock is not as readily ascertainable. We have already seen that the exchange adversely affected Buchman by depriving him of the distributive dividends that would other-

---

62. We intimate no view on whether the credit to her account standing alone, i. e. unaccompanied by the loan to AFR, constituted the receipt of "payment" resulting in the amount credited having to be paid to Buchman.

63. Contrast subparagraph F of the THIRD paragraph of the Buy-Sell Agreement where Pathy expressly agreed to guarantee the obligations thereunder of Suzanne M. Pathy.

64. We have already held that Pathy's transfer of his Series B AFR debentures

to deMontmollin was not in breach of the subordination provisions.

65. The fact that both the Pathys were officers and directors of AFR, and, as such, had a hand in passing the resolution allowing the exchange of debentures for stock is far from decisive. It was only deMontmollin who exchanged her debentures for stock and thereby extinguished the subordinated debt.

66. Individual Defendants' Memorandum After Trial, p. 65.

wise have been paid on the subordinated debts. Had deMontmollin remained a junior creditor of AFR, the dividends paid out of the bankrupt estate on her subordinated claims would have been allocated to Buchman's senior debt. Plaintiffs, therefore, are entitled to the amount of such dividends lost to Buchman as a result of the exchange; that is, the amount of the dividends deMontmollin would have been entitled to out of AFR's bankrupt estate had she not converted her debentures into stock.

Plaintiffs, unfortunately, have failed to furnish this Court with sufficient information upon which to predicate a computation of deMontmollin's distributive dividends.[67] Therefore, we are faced with this additional challenge: Should we dismiss the claim because of a failure of proof in respect of damages (the trial record now being closed) or should we attempt to secure further information upon which damages may be predicated. We have decided to adopt the latter course.

Accordingly, the question still to be resolved is as follows: Assuming deMontmollin presently held the Series A and Series B AFR debentures she converted into preferred stock, what would be the total amount of dividends thereon that she would receive out of the bankrupt estate? In order to satisfactorily respond to this question, which we regard as expressing the formula upon which damages are to be predicated, the parties are allowed fifteen (15) days from the date of this Opinion to serve and file proof in affidavit form addressed to this sole remaining issue. We hereby request the Trustee in Bankruptcy (to whom a copy of this Opinion on its filing date will be mailed) to aid the parties in their efforts to resolve this question.

As to liability only, the foregoing shall constitute this Court's Findings of Fact and Conclusions of Law.

67. Exhibit 39 does reveal that the assets in the hands of the Trustee amount to $91,179.35 while the total general claims aggregate $2,011,318.21.