19-4281-cv (L)
*Thomas Jennings v. Yurkiw, et al.*

# In the
# United States Court of Appeals
## For the Second Circuit

_____

August Term, 2020

Nos. 19-4281-cv (Lead), 19-4370-cv (XAP)

THOMAS JENNINGS,

*Plaintiff-Appellee-Cross-Appellant*,

v.

POLICE OFFICERS ANDREW YURKIW, AMBER LAGRANDIER, JOSEPH
SOLOMITO,

*Defendants-Appellants-Cross-Appellees*,

CITY OF NEW YORK, OFFICER JOHN DOE 3, SERGEANT SHAUN
BROWN, SHIELD NO. 875, IN THEIR INDIVIDUAL AND OFFICIAL
CAPACITIES AS EMPLOYEES OF THE CITY OF NEW YORK,

*Defendants.*

_____

Appeal from the United States District Court
for the Eastern District of New York
No. 14-cv-6377, Steven M. Gold, Magistrate Judge, Presiding.
Argued: February 9, 2021; Decided: November 17, 2021

Before:

PARKER, LOHIER, and MENASHI, *Circuit Judges*.

Defendants-Appellants Andrew Yurkiw, Amber LaGrandier, and Joseph Solomito, officers of the New York City Police Department, appeal from a judgment of the United States District Court for the Eastern District of New York (Gold, *M.J.*). The judgment was entered pursuant to a jury verdict and a retrial on damages, awarding $90,000 in compensatory damages and $355,000 in punitive damages to Plaintiff-Appellee Thomas Jennings on his claims against the officers for excessive force. The officers contend that the jury's $355,000 punitive damages award should be deemed so high as to shock the judicial conscience and that the district court abused its discretion in upholding it. Jennings, for his part, cross-appeals the district court's remittitur after the first trial of the compensatory damages award from $500,000 to $115,000 and remittitur of the punitive damages award from $2,500,000 to $140,000.

We conclude that the district court did not abuse its discretion in upholding the jury's $355,000 punitive damages award after retrial and that the damages were reasonable in light of the officers' misconduct.

On Jennings's cross-appeal, we conclude that the district court did not abuse its discretion in remitting the compensatory damages award after the first trial to $115,000. The damages jury's compensatory award of $90,000 after retrial stands.

AFFIRMED

_____

JESSE A. TOWNSEND,
Assistant Corporation Counsel,
Richard Dearing,
Devin Slack,
*for* James E. Johnson,
Corporation Counsel of the City of New York,
*for Defendants-Appellants-Cross-Appellees*.

SCOTT A. KORENBAUM
New York, NY;
Amy Rameau,
The Rameau Law Firm, Brooklyn, NY;
Michael Lumer,
Lumer Law Group, New York, NY
*for Plaintiff-Appellee-Cross Appellant*.

—————————————

BARRINGTON D. PARKER, *Circuit Judge*:

Thomas Jennings was arrested on April 23, 2014, and charged with the felony of second-degree assault, among other things, after the arresting officers falsely claimed that Jennings struck one of them multiple times while resisting arrest arising from a domestic dispute. Jennings was held in custody until May 2, when he was released on bail from Rikers Island. All charges were later dismissed on motion of the district attorney.

Jennings brought suit under 42 U.S.C. § 1983 against New York City Police Officers Andrew Yurkiw, Amber LaGrandier, and Joseph Solomito, alleging that the officers subjected him to unprovoked, excessive force, and then took substantial coordinated steps to cover up their misconduct. After two trials in the Eastern District of New York before Magistrate Judge Steven M. Gold (the second focused exclusively on damages), two separate juries awarded Jennings substantial punitive damages.

In the initial trial the jury returned a verdict for Jennings finding the officers jointly and severally liable for $500,000 in compensatory damages. The

jury awarded punitive damages of $1,000,000 against Yurkiw and $750,000 each against LaGrandier and Solomito, for a total of $2,500,000 in punitive damages.

The defendants moved for remittitur. The court granted the motion and ordered a new trial on damages unless Jennings accepted remittitur of the compensatory damages from $500,000 to $115,000, the punitive damages against Yurkiw from $1,000,000 to $120,000, and the punitive damages against LaGrandier and Solomito from $750,000 to $10,000 each. Jennings declined remittitur, and the court conducted a retrial on damages.

The second jury returned a verdict finding the officers jointly and severally liable for $90,000 in compensatory damages. The jury also awarded punitive damages of $250,000 against Yurkiw, $75,000 against LaGrandier, and $30,000 against Solomito, for a total of $355,000. Defendants again moved for remittitur and this time the district court denied the motion. On this appeal, the officers claim that the second jury's punitive damages award was too high and that the district court abused its discretion in failing to remit it. For the reasons that follow, we affirm.

On his cross-appeal, Jennings challenges the district court's remittitur of his compensatory damages award from $500,000 to $115,000. He concedes that the first jury's $2.5 million punitive damages award warranted some remittitur but contends that the court erred in remitting the first jury's punitive damages award to $140,000 and its compensatory damages award to $115,000. For the reasons that follow, we affirm the district court's remittitur following the first trial.

4

# BACKGROUND[1]

At the first trial, the jury heard testimony that on April 23, 2014, in Brooklyn, NY, Jennings picked up his three-year-old son from day care and went to the apartment of his son's mother, Daquanna Henry, to retrieve some of his son's belongings. Jennings testified that an altercation with Henry ensued and that he left the apartment, went to the lobby of the building, and called 911 for assistance.

NYPD officers Yurkiw, Solomito, and LaGrandier responded to the scene. LaGrandier entered Henry's apartment while Yurkiw and Solomito waited outside with Jennings, who was holding his son. Jennings testified that while he spoke with Yurkiw, LaGrandier emerged from the apartment and snatched Jennings's son from his arms while the child cried and attempted to reconnect with his father. LaGrandier then grabbed Jennings by the clothing and pinned him against the wall, at which point Yurkiw, without warning, punched Jennings twice in the face. Jennings testified that the blows were sufficiently hard that he fell to the ground and "was just out of it from there." Joint Appendix ("J. App'x") at 561–62. Instead of intervening to stop the attack, LaGrandier and Solomito joined Yurkiw in continuing the beating. Jennings testified that he fell in and out of consciousness as LaGrandier and Yurkiw dragged him from the apartment through the lobby and into a police car.

---

[1] We view the facts in the light most favorable to Jennings, the prevailing party, and view all evidence in the light most favorable to sustaining the jury's verdict. *See Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 195 (2d Cir. 2004); *Payne v. Jones*, 711 F.3d 85, 98–99 n.10 (2d Cir. 2013).

In the immediate aftermath of the arrest, the officers began fabricating a sharply different narrative. In reports to others, in official paperwork, and then at trial, they claimed that in attempting to evade arrest and flee, Jennings assaulted Yurkiw. Yurkiw testified that Jennings took off at a "full sprint" down the apartment hallway after being told he was under arrest, and that while attempting to flee, Jennings turned around and punched Yurkiw in the head, face, and the side of his body. J. App'x at 190. Solomito offered a slightly different account of what occurred. He testified that Yurkiw grabbed Jennings by the wrist, that "Jennings turned and punched Officer Yurkiw on the top of the head," and then took off running while "pulling [Yurkiw] down the hallway." J. App'x at 368. Solomito then testified that Yurkiw fell, and that he (Solomito) had to jump over him (Yurkiw) to tackle Jennings to the ground before arresting him. LaGrandier, for her part, offered ambiguous testimony. At one point, she testified that she was "running besides [sic] Thomas Jennings" while he attempted to flee. J. App'x at 481. She also testified that she was beside Yurkiw and ultimately that she didn't see who threw Jennings to the ground.

The officers' credibility was sharply called into question by video evidence containing footage of Yurkiw and LaGrandier dragging Jennings's limp body through the lobby of the building and outside to the police vehicle. This evidence tended to corroborate Jennings's testimony that, as a consequence of the beating, he was in and out of consciousness and unable to walk on his own.

Jennings testified that he had visible injuries and requested medical assistance, but that these requests were ignored. Jennings was transported to the

81st precinct. After he had spent time in a cell an officer eventually called for medical assistance, and Jennings was taken by ambulance to Woodhull Hospital.

After examining Jennings at Woodhull on the day of his arrest, a doctor determined that Jennings had physical injuries including a right eye hematoma, several fractures in both nasal walls, a deviated nasal septum, and an inflamed ethmoid sinus. Jennings was also seen by a medical professional two days later on Rikers Island who confirmed those injuries and further testified that in addition to Jennings's nasal fracture, there was bruising on the area of Jennings's right eye. This testimony tended to show that his bruising was sufficiently localized that it came from a fist, and not from a fall as Yurkiw had testified.

The jury heard additional testimony concerning the officers' coverup of the beating. After the arrest, Officer Pelocka Binns—who had no personal knowledge of the arrest—prepared an arrest report based on information provided by Yurkiw that included allegations that Jennings had assaulted him. In support of this narrative, Yurkiw took a picture of what he claimed was a bump at the top of his head caused by Jennings's punches. He acknowledged that he took the photograph for the purposes of prosecuting Jennings for the assault, which requires physical injury as an element. Yurkiw testified that he went to Wyckoff Hospital to be treated for the bump. The treating physician's assistant recorded that Yurkiw's bump was "non-tender." J. App'x at 472. In other words, it did not hurt. During examination, a physician's assistant observed and documented visible bruising on Yurkiw's right index and middle finger knuckles, injuries that were consistent with his having thrown punches. Yurkiw, however, had not taken any photos of this bruising. In fact, Yurkiw—

7

contrary to contemporaneous medical documentation—testified that he "didn't have any bruising [on his knuckles] at that time." J. App'x at 125.

At the close of trial, the jury answered special interrogatories. Despite the officers' extensive testimony to the contrary, the jury found that at no point before or after the assault did Jennings attempt to flee from any of the officers or strike Yurkiw. The jury answered "No" to the question, "Do you find by a preponderance of the evidence that plaintiff Jennings attempted to flee from defendants or resist arrest?" J. App'x at 1199. The jury also answered "No" to the question "Do you find by a preponderance of the evidence that plaintiff Jennings punched or attempted to punch defendant Yurkiw?" J. App'x at 1200.

That jury awarded Jennings substantial compensatory and punitive damages. The officers moved for remittitur or a retrial, and Magistrate Judge Gold granted the motion for remittitur. The court concluded that LaGrandier and Solomito were less culpable than Yurkiw because "LaGrandier and Solomito used force against [Jennings] only after Yurkiw did, and the reprehensibility of their conduct is mitigated by the likelihood that their motivation included a desire to assist a fellow officer." Special Appendix ("Sp. App'x") at 62. Jennings rejected the remittitur and elected for a new trial on damages.

At the retrial, the district court determined that, in light of the jury's answers to the special interrogatories and its decision to award punitive damages, the jury would be asked only to determine the amount of damages but not to retry liability. We see no reason to disturb this ruling.

At the damages trial, Yurkiw was the only one of the officers who elected to testify, and more details about what occurred after the arrest emerged. The

8

arrest report containing information supplied by Yurkiw was received in evidence. The report detailed that "[Yurkiw] states that while [e]ffecting an arrest [Jennings] punched [Yurkiw] in the head causing swelling, redness and pain." Supplemental Appendix ("Supp. App'x") at 1. On the witness stand, Yurkiw denied reporting that no force was used in the arrest; but the arrest report stated that the officers had used *no* force. It was uncontroverted that the officer who prepared the arrest report did so on the basis of information received from Yurkiw and that Yurkiw knew that this account would be forwarded to the District Attorney's office for the purpose of prosecuting Jennings for the felony assault.

Jennings offered additional testimony about the officers' conduct following his arrest. He testified that after the beating, he asked Yurkiw and Solomito for medical attention. Yurkiw acknowledged that it was his "obligation as a police officer to request EMS, and if [he] thought [Jennings's injury] was that serious enough [sic], Interfaith [Hospital] [was] around the corner." J. App'x at 1719. Instead of being given medical attention, Jennings was brought to the police station. He was then placed in a cell and chained to a bar where he was subjected to insults from Yurkiw, who stood outside the cell and taunted him. Eventually, Jennings was taken from the police precinct to Woodhull Hospital by ambulance.

The jury returned a verdict awarding Jennings "(a) $90,000 in total compensatory damages, jointly and severally against all three defendants, (b) $250,000 in punitive damages against defendant Yurkiw, (c) $75,000 in punitive damages against defendant LaGrandier, and (d) $30,000 in punitive damages

9

against defendant Solomito, for a total of $355,000 in punitive damages." Special App'x at 12.

The officers again moved for remittitur of the punitive damages award. In denying their motion, the district court explained that:

> Having heard the evidence presented in support of plaintiff's claims at both the original trial and the retrial on damages, and having had the benefit of observing the verdicts returned by two juries after what presumably were careful deliberations, I cannot say that the second trial jury's punitive damages award is so high as to shock the judicial conscience and constitute a denial of justice.

Sp. App'x at 17–18 (quotation marks omitted).[2]

This appeal and cross-appeal followed.

## DISCUSSION

### I

*A. Legal Standards*

We review a district court's decision on a motion to remit punitive damages for abuse of discretion. *See Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996). The discretion enjoyed by trial courts in remitting damages is "relatively narrow." *Payne*, 711 F.3d at 100. That is because the ultimate question is whether the award "shock[s] the judicial conscience" or amounts to a miscarriage of justice. *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990). When, as here, a trial

---

[2] In denying remittitur, the district court also observed—in sharp distinction to its initial characterizations of LaGrandier's role at the first trial—that the evidence from the second trial supported the inference that "LaGrandier was the first of the officers to become physically aggressive with [Plaintiff]" and that "the jury may even have inferred that LaGrandier pinned plaintiff against the wall in anticipation of Yurkiw's blows." Sp. App'x at 18.

judge refuses to disturb a jury's award of a particular amount of damages, the two entities entitled to deference—the judge and jury—point in the same direction. *See Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1329 (2d Cir. 1990). Both have observed the witnesses and both have considered the evidence in the context of a trial involving live witnesses and cross examination.

Moreover, determining the amount of damages is a quintessential responsibility of juries. Here, two separate juries concluded that substantial punitive damages were appropriate. No officer contends that the jury was not properly instructed or that any irregularity occurred in the district court's management of the jury. And no officer has shown that the verdict from the second trial shocks the conscience or constitutes a miscarriage of justice.

## B. *Review of the Punitive Damages Award*

We review a jury's punitive damages award in accordance with *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). We consider: "(1) degree of reprehensibility of the defendant's conduct, (2) relationship of the punitive damages to the compensatory damages, and (3) criminal and civil penalties imposed by the state's law for the misconduct in question." *Payne*, 711 F.3d at 101. While these guideposts are non-exhaustive, they assist in determining whether a defendant had adequate notice of the magnitude of the sanctions to which his misconduct might expose him. *See Gore*, 517 U.S. at 574–75; *see also id.* at 606 (Scalia, J., dissenting) (observing that "the Court nowhere says that these three 'guideposts' are the *only* guideposts; indeed, it makes very clear that they are not"). In reviewing punitive damages awards, courts in this Circuit often

compare the award to rulings on awards in other cases. *See Payne*, 711 F.3d at 104.

### 1. Degree of Reprehensibility

In *Gore*, the Supreme Court noted that reprehensibility is "perhaps the most important" consideration in assessing the reasonableness of an award of punitive damages. 517 U.S. at 575. There, the Court identified certain "aggravating factors" that are "associated with particularly reprehensible conduct" and contribute to the sense that "some wrongs are more blameworthy than others." *Id*. at 575–76. Those aggravating factors include: (1) whether a defendant's conduct was marked by violence or presented a threat of violence, (2) whether a defendant's conduct evinced trickery or deceit as opposed to mere negligence, and (3) whether the record supports a finding of intentional malice. *Id*.

These factors all weigh against the officers. The officers attempt to diminish the seriousness of their misconduct by characterizing their unprovoked beating as "a few minutes of violence against [Jennings]," Officer Br. at 24. But, "a few minutes of violence" is not a trivial matter. The jury heard testimony that Jennings received an unprovoked beating at the hands of the officers.  It heard that LaGrandier snatched Jennings's three-year-old son from his arms, grabbed Jennings and pinned him against the wall. Yurkiw then struck Jennings in the face with such force that he fell to the ground, at which point he began experiencing "all kind of blows coming from everywhere." J. App'x at 563. The jury heard testimony from Jennings that he never threw punches at any of the officers, attempted to flee, or otherwise resisted arrest. Even though Jennings had

visible injuries, he was brought straight to the police precinct, placed in a cell, chained to a bar, and denied the medical attention he requested. As the trial court observed:

> The evidence was sufficient to support a finding that Defendant Yurkiw delivered two unprovoked and violent punches that rendered Plaintiff semiconscious, and that all Defendants then engaged in administering further strikes to an already subdued arrestee. Under the reprehensibility analysis, the jury could also have reasonably considered the fact that Plaintiff had called for help as the victim of an assault, only to find himself subjected to excessive force by the responding officers.

Sp. App'x at 56–57.

Further, the jury could rightly have determined and apparently did determine that the excessive force was made the more reprehensible because none of the officers intervened to stop the attack, as each was required to do. We have been clear that "a law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988); *see also DiSorbo v. Hoy*, 343 F.3d 172, 189 (2d Cir. 2003) (recognizing that punitive damages may be higher where the misconduct involved several officers).

The reprehensible nature of the officers' conduct is underscored by the elaborate steps they took to cover up their misconduct. The jury heard and was entitled to consider a record that included falsified charging documents, false accounts of the beating, faked or exaggerated injury, and perjured trial

13

testimony.[3] *See Gore*, 517 U.S. at 579 (noting that factfinders may look to whether the record "discloses . . . deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive").

**2. Ratio of Actual Harm to the Punitive Award**

Next, *Gore* directs reviewing courts to ask "whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." *DiSorbo*, 343 F.3d at 187. While labeled a ratio, the reasonableness determination "does not entail a simple mathematical formula, as there may be cases where a particularly egregious act has resulted in only a small amount of economic damages." *Id.* (quotation marks omitted). Given the constellation of intentional misbehavior by the officers, we see nothing untoward about the 1:4 ratio

---

[3] The officers' contention that "alleged behavior outside of the liability findings" is irrelevant to the determination of punitive damages is a bad argument extracted from mischaracterizations of our caselaw. For example, the officers cite *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003) for the proposition that "a punitive award cannot rest on conduct independent from the acts upon which liability was premised," Officer Reply Br. at 7 (quotation marks omitted). Yet that is not the rule from *State Farm*.

In *State Farm*, the Supreme Court overturned the Utah Supreme Court's imposition of a punitive damages award where "State Farm was being condemned for its nationwide policies rather than for the conduct directed toward the [plaintiffs]." 538 U.S. at 420. The Court was concerned that the Utah courts "adjudicate[d] the merits of *other parties'* hypothetical claims against [State Farm]," *id.* at 423 (emphasis added), and that the company was punished "for conduct that may have been lawful where it occurred," *id.* at 421. Even so, the Court *still* found that this evidence of potential harm to third parties—clearly outside the liability findings—may have been relevant if it had "a nexus to the specific harm suffered by the plaintiff." *Id.* at 422. And here, there is no credible contention that any of the misconduct that was before the jury was directed at anyone but Jennings. The officers' misconduct following the arrest clearly had a nexus to their use of excessive force and supports punitive damages.

14

between compensatory and punitive damages. *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 149 (2d Cir. 2015) ("[T]here is no rigid upper limit on a ratio of punitive damages to compensatory damages . . .").

Even where compensatory damages are substantial, punitive damages awards that are a multiple higher may be warranted because of the deterrent function of punitive damages.[4] "The purpose of § 1983 is not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future constitutional deprivations, as well." *Ciraolo v. City of New York*, 216 F.3d 236, 242 (2d Cir. 2000) (Calabresi, J., concurring); *see City of Newport v. Fact Concerts, Inc.*, 453 U.S. 248, 266–68 (1981) ("[T]he deterrence of future abuses of power by persons acting under color of state law is an important purpose of § 1983."). Because of this deterrent function, extra-compensatory damages are warranted where the misconduct was designed to escape detection.[5] "Where the injurer makes active efforts to conceal the harm, [underdeterrence] is of course

---

[4] The jury was properly instructed that in deciding whether to impose punitive damages and the proper quantum of damages, it should consider "whether punitive damages are likely to deter or prevent others from performing wrongful acts like the ones, one or more of the defendants, in this case you find to have committed" and "the degree to which an award of one sum or another will deter the defendant or persons like him or her from committing wrongful acts in the future." J. App'x at 884.

[5] As Judge Richard Posner observed in *Kemezy v. Peters*, 79 F.3d 33 (7th Cir. 1996):

> When a tortious act is concealable, a judgment equal to the harm done by the act will underdeter. Suppose a person who goes around assaulting other people is caught only half the time. Then in comparing the costs, in the form of anticipated damages, of the assaults with the benefits to him, he will discount the costs (but not the benefits, because they are realized in every assault) by 50 percent, and so in deciding whether to commit the next assault he will not be confronted by the full social cost of his activity.

*Id.* at 35.

15

exacerbated." *Ciraolo*, 216 F.3d at 243 (Calabresi, J., concurring). Given the extensive misconduct directed at escaping liability, the deterrent capacity of the 1:4 ratio presented here passes muster.

### 3. Sanctions for Comparable Conduct

*Gore* next directs us to compare the punitive damages to "civil or criminal penalties that could be imposed for comparable misconduct." 517 U.S. at 583. The court below observed that the comparable criminal provision for the misconduct that the first jury found would be assault in the third degree, a misdemeanor punishing reckless or intentional physical injury of another person. The maximum penalty for this crime would have been one year of imprisonment and a $1,000 fine, which "strongly supports the imposition of some punitive award, but it tells very little about whether the particular award was excessive." *Payne*, 711 F.3d at 104. Based on this reference to state law, the officers argue that "[t]here is no analogous provision of criminal law that gave the officers notice that they were putting at risk up to several years' worth of pay (in the case of the award against Officer Yurkiw)." Officer Br. at 33.

Yet each of the officers knew full well that their misconduct could expose them not only to state sanctions but to federal criminal sanctions as well. The N.Y.P.D. Use of Force Guidelines put the officers on notice that: "both federal and state laws provide for criminal sanctions and civil liability against uniformed members of the service, when force is deemed excessive, wrongful or improperly

16

applied." N.Y.P.D. Patrol Guide, Use of Force Guidelines § 203-11 (Effective 08/01/13).[6]

Where a jury imposes punitive damages for a violation of § 1983, the penalties imposed under federal criminal law offer a useful comparison. Section 242 provides:

> Whoever, under color of any law. . . subjects any person . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States . . . and if bodily injury results from the acts committed in violation of this section . . . shall be fined under this title or imprisoned not more than ten years, or both . . . .

18 U.S.C. § 242. Congress has authorized a fine for violation of this section of up to $250,000. 18 U.S.C. § 3571(b)(3). Section 242 provides a reference point to evaluate excessive force awards against individuals acting under color of law.

This provision also satisfies the notice concerns raised by *Gore*, as the officers were unquestionably on notice that abuse of power could lead to a term of imprisonment as well as to a substantial fine. If anything, these penalties understate the notice the officers received. As we explained in *Lee*, "training as a police officer [gives officers] notice as to the gravity of misconduct under color of [their] official authority, as well as notice that such misconduct could hinder [their] career[s]." 101 F.3d at 811.

---

[6]     In pertinent part, the guidelines also provide:

Members of the service are required to maintain control or intervene if the use of force against a subject clearly becomes excessive. Failure to do so may result in both criminal and civil liability.

N.Y.P.D. Patrol Guide, Use of Force Guidelines § 203-11 (Effective 08/01/13).

### 4. Comparison with Punitive Damages Awards in Similar Cases

Because each case presents a unique set of facts and circumstances, "our task is not to balance the number of high and low awards and reject the verdict . . . if the number of lower awards is greater." *Ismail*, 899 F.2d at 187. A review of our cases confirms that the verdict was within the range where similar punitive damages awards were determined to be reasonable.

For example, in *Payne*, this Court remitted an award of $300,000 to $100,000 against an individual officer where there were "significant mitigating factors, so that the degree of reprehensibility was not all that high." 711 F.3d at 101. Yurkiw's conduct alone, in contrast, was more reprehensible and lacks comparable mitigating factors. In the absence of significant mitigating factors such as those present in *Payne*, we do not believe that the punitive award against any of the officers warrants remittitur. Here, the total punitive damages award of $355,000 against all officers, including the $250,000 levied against Yurkiw, are below the amounts this Court has previously found reasonable against several officers and an individual officer for similarly reprehensible conduct. *See, e.g.*, *O'Neill*, 839 F.2d at 13–14 (sustaining an award against two officers totaling roughly $438,000, accounting for inflation); *Ismail*, 899 F.2d at 185-87 (sustaining an award against one officer totaling roughly $319,000, accounting for inflation).[7] This is true even if we were to ignore that Yurkiw and the other officers took steps to conceal their use of excessive force. Taking the officers' deliberate concealment of evidence into account only heightens the degree of malice

---

[7] These totals are adjusted for inflation using the Bureau of Labor Statistics' Inflation Calculator to estimate dollar equivalents. *See* CPI Inflation Calculator, U.S. BUREAU OF LAB. STAT., bls.gov/data/inflation_calculator.htm.

associated with their excessive force and further confirms that the punitive damages were supported by the record evidence.[8]

## II.

Jennings argues on cross-appeal that the district court erred by remitting the compensatory damages award from $500,000 to $115,000 after the first trial.[9] We disagree. The court found that Jennings's physical injuries from the excessive force were nasal fractures, various other swelling and bruises after his arrest, and the longer-lasting injuries of a crooked nose and headaches, for which Jennings had not sought ongoing treatment. Moreover, Jennings also suffered the

---

[8] We easily reject the officers' contention that the district court's decision to uphold the punitive damages award after retrial was barred by the law of the case doctrine. The law of the case is "informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine." *Prisco v. A & D Carting Corp.*, 168 F.3d 593, 607 (2d Cir. 1999). "Prejudice" in this context refers not to bare harm, but to surprise or "lack of sufficient opportunity to prepare armed with the knowledge that the prior ruling is not deemed controlling." *Id.* (cleaned up). Therefore, in this Circuit, the law of the case doctrine "need not be applied when no prejudice results from its omission." *First Nat'l Bank of Hollywood v. American Foam Rubber Corp.*, 530 F.2d 450, 453 n.3 (2d Cir. 1976).

Moreover, the case for applying the doctrine is considerably weaker where, as in the context of a conditional remittitur, an issue is relitigated as a matter of right. *Cf. Hetzel v. Prince William Cnty.*, 523 U.S. 208, 211–12 (1998) (per curiam) (noting that the district court was correct to offer the option of a new trial when it entered judgment for reduced damages). The officers claim no prejudice or surprise from the district court's reconsideration of the proper quantum of punitive damages before or after the retrial, particularly where the district court noted that its remittitur was a "speculative, arbitrary approximation[]." Special App'x at 17. Nor could they. The officers requested remittitur. They were on full notice that there would be a retrial on damages and had a fair opportunity to present their defenses to the juries and to the district court.

[9] Jennings also argues that the district court erred in remitting the first punitive damages award from $2,500,000 to $140,000. But as explained above, the $355,000 in punitive damages levied by the jury after retrial and upheld by the district court is within a range that "represents a reasonable view of the evidence." Pl. Br. at 28.

emotional trauma of experiencing excessive force in the presence of his son. The district court remitted the compensatory award from $500,000 to $115,000, which it observed was on the higher end for non-permanent physical injuries after comparing Jennings's injuries to those experienced in comparable § 1983 cases.

Jennings identifies no error, legal or factual, in this conclusion. Rather, in canvassing cases where plaintiffs suffered broken noses and jaws, Jennings argues that the district court should have remitted the award to between $150,000 to $200,000. However, unlike those plaintiffs, Jennings did not undergo surgery or otherwise seek ongoing treatment that would contribute to the pain and suffering supporting the compensatory awards. And regarding his emotional damages, Jennings's evidence was not extensive. The district court did not exceed its discretion in remitting Jennings's compensatory damages award to $115,000, an "amount at the very high end of awards for non-permanent injuries." Sp. App'x at 53. Finally, we note that the district court's conclusion that $115,000 rests on the high end for Jennings's injuries for a single claim of excessive force is confirmed by the fact that at the retrial the jury awarded $90,000 in compensatory damages. For these reasons, we conclude that the district court did not abuse its discretion in remitting compensatory damages following the first trial.

## CONCLUSION

We have considered the parties' remaining contentions and find them to be without merit. The judgment of the district court is **AFFIRMED**.